UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NELSON LEWIS,

               Petitioner,

     -vs-

FLOYD BENNETT,

             Respondent.

_____

**DECISION AND ORDER**

No. 03-CV-0063

## I.    Introduction

Petitioner, Nelson Lewis ("Lewis"), filed this *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his October 29, 1999 conviction following a jury trial

in New York State Supreme Court (Monroe County) on charges of second degree murder, first

degree robbery, and second degree robbery. The parties have consented to disposition of this

matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## II.    Factual Background and Procedural History

During the afternoon of September 2, 1998, Carl Viele ("Viele") was invited to the

apartment of his friend, Christopher DiVita ("DiVita"), for the purpose of using cocaine. When

Viele arrived several minutes later, DiVita was not in the apartment, but the door had been left

open so Viele went inside. Viele looked out the window into the parking lot of the Golden Fox

restaurant, which occupied the first floor of DiVita's apartment building. He saw DiVita leaning

into a gold-colored Audi or Jetta and talking to someone inside the car. Viele called down to

DiVita, and DiVita signaled that he would be right up. DiVita and the man in the car, whom

Viele later identified as Lewis, both came upstairs. *See* T.566-71.[1] DiVita then ordered an "eight-ball" of cocaine from Lewis, which Lewis priced at $125. Lewis promised to return in about ten minutes with the drugs, and DiVita and Viele waited in the apartment. T.570-72.

About ten minutes later, the doorbell rang. Viele looked out the window and saw two men whom he did not know waiting downstairs; he also saw Lewis, sitting in the same gold-colored car, "motioning like they had the stuff; let them up." Viele did so and the men, whom he identified at trial as co-defendants Wayland Williams ("Williams") and James Vaughn ("Vaughn"), came in. Viele described the next few moments as follows:

> We were sitting in silence for like a whole minute, and then Chris was like, "Well, what's up?" And I believe Mr. Williams said, "Well, do you have the money?" And Chris said, "Yeah," and took out 125 and placed it on the table. Sat there in silence for, I don't know, few seconds and then Chris was like, "Do you have the stuff?" And then I believe he [Williams] said, "Well, it's not enough money," and then Chris said, "What do you mean?" And at that time, Mr. Vaughn pulled out a gun and put it to my head and Mr. Williams pulled out a gun and put it to Chris's head.

Vaughn ordered Viele not to move. DiVita, however, did move. He attempted to stand up as Williams grabbed the money; Williams struck him in the forehead with the gun. DiVita started to shout to his next-door neighbor, Patricia Hannon ("Hannon"), for help, and to bang on the wall separating her apartment from his. A struggle ensued in which Williams, who was considerably smaller than DiVita, repeatedly hit DiVita with the gun in order to prevent DiVita from leaving the apartment. T.579-82.

Vaughn, who had been holding Viele at gunpoint in the kitchen, responded to the commotion in the hallway between Williams and DiVita. Viele could not see the other men, but

---

[1] Citations to "T.__" refer to the trial transcript.

he heard more blows being struck. Someone shouted, "Just shoot him!" A few seconds later, Viele heard a shot. T.583-84. Hannon, DiVita's next-door neighbor, testified that at about 2:15 p.m. that afternoon she heard banging on the wall coming from DiVita's apartment and a voice which she recognized as DiVita's shouting, "Patty, Patty, please help me." Just as she was starting to call 911, she heard what sounded like a gunshot.

Right after the gunshot, Viele heard one of the men say, "Well, what about the other one?" However, neither Vaughn nor Williams came back into the kitchen. When Viele ventured out, he saw blood on the walls of the hallway where DiVita, covered in blood, was lying on back with his eyes closed. Viele called out to him but received no response. DiVita's body twitched for a few moments and then became still. Viele fled, afraid that Williams and Vaughn might return. T.585-87. Instead, Williams and Vaughn drove away in the gold-colored vehicle that Viele had seen Lewis using to drop them off at DiVita's apartment. Shortly after 2:15 p.m. George Weiner ("Weiner"), a technician for a utility company, observed a man wearing a camouflage-patterned, hooded jacket, running along Culver Road near the intersection of Parsells Avenue. Moments later, as Weiner drove his van into a parking lot a block away, he was cut off by a gold-colored sedan. The man in the camouflage jacket ran in front of the van and shouted to the driver of the gold-colored sedan, "Hurry up and open the door," and then got into the back seat. Weiner, suspicious of the man's inappropriate apparel (it was sunny and 80 degrees that day) and haste, noted the license number of the gold-colored sedan. Upon hearing sirens a few minutes later, Weiner reported the incident and the plate number to the police. T.528-43.

The license plate number was traced to a gold-colored 1986 Audi registered to Shanika

Henry ("Henry"), whom police records indicated was Lewis's girlfriend. T.841-45; 1230-31. Lewis was spotted a few days later in a driveway on the street where Henry lived; upon seeing the police, Lewis fled but was apprehended after a brief chase. The Audi, which had been stripped of its license plate and registration certificate, was found in Henry's backyard. T.1142-46, 1236-40.

Lewis agreed to waive his rights and speak to police about the DiVita incident. Initially, Lewis denied any involvement in the robbery and murder. After being informed that there were three witnesses, including "the white guy that was in the apartment," Lewis admitted that he had driven his girlfriend's Audi to DiVita's apartment where, in the presence of Viele, he agreed to supply DiVita with an eight-ball of cocaine for $115.[2] A "dude" known as "Shorty" had agreed to front the cocaine. T.1261-63, 1329-32.

Lewis claimed that he was encouraged to revise his plans by his cousin, Williams, and Williams's friend, a person Lewis called, "G." (Vaughn later acknowledged that "everyone" called him by the nickname, "G.") When Vaughn informed Lewis and Williams that he had heard that DiVita had just come into about $3,000, Williams proposed that rather than "serve" DiVita the cocaine, they "just go back and rob him of the money that he had." Lewis agreed to drive Williams and Vaughn to DiVita's apartment. The plan was to "whup [*sic*] his ass" and "make sure that Chris spent his money on [them]" rather than on Shorty's cocaine. T.1263-65, 1331-34.

Lewis related that the robbery did not go as planned. Williams returned to the gold-

---

[2] The Court notes that Viele's testimony was that Lewis agreed to sell the eight-ball of cocaine to DiVita for $125.

colored Audi in which Lewis was waiting about four minutes after Williams and Vaughn had gone inside. Consistent with Weiner's observations, Vaughn came out of the building alone, several minutes later, and got into the back seat. When Lewis noticed that Vaughn had blood on his face he asked what had happened. According to Lewis, Vaughn said that he "had to pop the guy" because he put up a fight and refused to let Vaughn go. Vaughn later showed Lewis a .38-caliber revolver with one chamber empty. Lewis maintained that up until that point, he "did not know that these guys had guns." Lewis described his cousin Williams as a "good fighter" who did not need a gun to defend himself. Lewis also denied sharing in the proceeds of the robbery. T.1265-66, 1333-34.

The trial court instructed the jury as to the elements of felony murder under New York Penal Law § 125.25(3), including the affirmative defense under that section. The court also instructed the jury on robbery, as charged in the remaining counts, as well as the principles of accessorial liability under New York Penal Law § 20.00. The jury returned a verdict finding Lewis guilty of all counts in the indictment. Lewis was sentenced to concurrent sentences, the longest of which was seventeen and one-half years to life. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on direct appeal. The New York Court of Appeals denied leave to appeal. This habeas petition followed. For the reasons set forth below, relief is denied and the petition is dismissed.

## III.    Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996 by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in

a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

## IV.   Discussion

### A.    Merits of the Petition

#### 1.    *Batson* claim

Lewis charges the prosecutor exercised two of his peremptory challenges in a racially discriminatory manner. Lewis, who is African-American, alleges that the prosecutor used two of its peremptory challenges against two of the four African-American jurors on the panel, and argues that it did so because of their race, in violation of *Batson v. Kentucky*, 476 U.S. 79, (1986). On direct appeal, the state court found that the trial court "properly rejected defendant's *Batson* claim with respect to the prosecutor's peremptory challenges to two potential jurors," concluding that the "prosecutor provided race-neutral reasons for excluding the two potential jurors[.]" *People v. Lewis*, 295 A.D.2d 926, 744 N.Y.S.2d 738, 739 (App. Div. 4th Dept. 2002) (citation omitted).

*Batson v. Kentucky* provides the standard pursuant to which trial courts determine whether a party violated the Fourteenth Amendment through its use of a peremptory challenge to a juror. As the Supreme Court has explained, *Batson* outlines a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite

> showing has been made, the burden shifts to the prosecutor to articulate a
> race-neutral explanation for striking the jurors in question. Finally, the trial court
> must determine whether the defendant has carried his burden of proving
> purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (citing *Batson*, 476 U.S. at 96-98) (internal

citations omitted). This three-step inquiry delimits this Court's consideration of the arguments

raised by petitioner. *See id.* The Second Circuit has explained that under the first step, "a trial

court must decide whether the party challenging the strike has made a prima facie showing that

the circumstances give rise to an inference that a member of the venire was struck because of his

or her race. Such a prima facie case may be established, for example, by showing a pattern of

strikes against minority prospective jurors." *Galarza v. Keane*, 252 F.3d 630, 636 (2d Cir. 2001).

If the party making the *Batson* challenge establishes a prima facie case of racial

discrimination, the trial court must require the non-moving party to proffer a race-neutral

explanation for striking the potential juror. *Id.* (citing *Batson*, 476 U.S. at 97). However, "[o]nce

a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial

court has ruled on the ultimate question of intentional discrimination, the preliminary issue of

whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at

359. Notably, the second step of *Batson* does not require the non-moving party to give an

explanation that is "persuasive or even plausible." *Galarza*, 252 F.3d at 636 (citing *Purkett v.

Elem*, 514 U.S. 765, 768 (1995)).

Here, whether or not Lewis established a prima facie case became moot since the

prosecutor, without any prompting or inquiry from the trial court, offered race-neutral reasons

for striking both Juror No. 15 from the first round (Mr. Thompson) and Juror No. 11 from the

second round (Ms. Cherubin):

Mr. Huether:   I challenge number 15 [Thompson].

Mr. Hanlon:   Is that for cause?

Mr. Huether:   Not for cause. Actually, yes, it is because on my quote here he said he's got knowledge of the case. He said he thinks he can listen. Doesn't know what he can do with that. General responses. Real inattentive to some of the questioning.

Mr. Hanlon:   I would oppose that. I did specifically ask Mr. Thompson during the discussion with Mr. Bour concerning his prior involvement in reading and as to that question. He said he would accept the evidence as it came in through the court.

The Court:   Denied for cause.

Mr. Huether:   Challenge peremptorily.

Mr. Hanlon:   Ask for *Batson*.

Mr. Huether:   Again, your Honor, he is single, four children, works at the convention center as a waiter. I was discussing with him and looking around the panel several times during the questioning, and he was not even paying attention. He was looking out the open window of the courtroom. Inattentiveness was very disturbing, and I've marked a couple of other people that, frankly, Mr. Hanlon was, [*sic*] that I had the same concerns with. I noticed some of them not paying attention during some of the questions I was asking.

Mr. Hanlon:   Your Honor, I disagree. I think human intent [*sic*] with respect to that. I would ask that the Court exercise its discretion.

The Court:   I will grant the challenge.

Mr. Hanlon:   Exception for the record.

T.157.

In the next panel of jurors, the prosecutor challenged Juror Number 11, Ms. Cherubin and Juror Number 16, Mr. Kwiatowski. Defense counsel asked "for an explanation for 11," although he did not say whether Cherubin was a minority and he did not mention *Batson*. This exchange followed:

Mr. Huether:   Your Honor, she's single, works in day care, has no kids, no hobbies, no interests[,] no outside activities. Basically, again, I though her responses were very terse, and I noticed during the selection process she was not paying attention whereas the person next to her gave full attention; [was] married, has children, [is] a member of the community. That's what I'm looking for.

Mr. Hanlon:     Your Honor, I submit that's the second of four – There was [*sic*] only four members of the minority [*sic*] with respect to this entire panel. There was nothing untoward with respect to her questions [*sic*]."

Mr. Huether:    I have the advantage of watching the selection process during my questions. That's why I went over the many questions and topics that I did, to watch for responsiveness. I felt there was none there. Same issue that I had with the other juror, same issue. I'm striking number 16. Didn't understand what we were talking about. Looked off.

The Court:      Grant the challenge. Exception is noted.

T.179-80.

Because the prosecutor moved to the second step of the *Batson* by offering reasons for striking the two jurors in response to defense counsel's request for an explanation, *Batson*'s step one is not at issue here. *See Hernandez*, 500 U.S. at 359. "The Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here." *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003) (citing *Hernandez*, 500 U.S. at 359) ("Once [the nonmoving party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a prima facie showing becomes moot.").

Lewis contends that the reasons given by the prosecutor for challenging the two black jurors were not race neutral. "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, *assuming the proffered reasons for the peremptory challenges are true*, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359 (emphasis supplied). In addressing this issue, the Court "must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it

results in a racially disproportionate impact . . . .*Proof of racially discriminatory intent or purpose is required* to show a violation of the Equal Protection Clause.'" *Id.* (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65 (1977) (ellipsis in original) (emphasis supplied)).   With respect to the second step, the reasons given for the prosecutor's peremptory challenges–displaying lack of attentiveness, being unmarried, lacking outside hobbies and interests, having no children–were facially race-neutral. In other words, a discriminatory intent is not inherent in the asserted reasons. As such, they satisfy the prosecution's burden at the second *Batson* step. *See Purkett v. Elem*, 514 U.S. at 768 ("At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."). Nonetheless, the *Batson* analysis recognizes that a race-neutral reason may be rational and still be a pretext for discrimination. *See Hernandez*, 500 U.S. at 363; *accord Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000).

On the proper record, inattentiveness can be a valid race-neutral reason for a peremptory strike. In *Messiah v. Duncan*, 435 F.3d 186, 200 (2d Cir. 2006), the Second Circuit found no pretext with respect to the prosecutor's striking of juror reported to have been reading a newspaper, noting that "[a] prosecutor may reasonably have qualms about a panelist who fails to pay attention during voir dire." *See also United States v. Rudas*, 905 F.2d 38 (2d Cir. 1990) ("In addition, the Government's concern about a juror's inattentiveness [struck juror "was or appeared to be sleeping" during voir dire] is a good reason for its exercising a peremptory challenge.") (citing *United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir. 1988) (upholding district court's finding that the prosecutor had provided "neutral, specific and reasonable explanations

substantiating legitimate exclusions of each of the veniremembers removed" where district court had found that several of those jurors excused by the government had displayed "angry, arrogant, or flippant demeanors that led the government to be concerned that they might be insufficiently serious about jury duty and perhaps even disdainful of the judicial process"); *United States v. Sherrills*, 929 F.2d 393, 394-95 (8th Cir. 1991) ("We believe a prosecutor's explanation of challenges on the grounds of inattentiveness deserves careful scrutiny by the district court, and special care by counsel to fully develop the record concerning the specific behavior by venire members motivating counsel to make a peremptory challenge based on inattentiveness. On the record before us, however, we can only conclude that there was support for the challenges made, and [defendant] has not demonstrated that the district court's ruling was clearly erroneous."); *Barfield v. Orange County*, 911 F.2d 644, 648 (11th Cir. 1990) (hostile facial expressions and body language), *cert. denied*, 500 U.S. 954 (1991); *United States v. Garrison*, 849 F.2d 103, 106 (4th Cir.) ("The government asserts that it struck jurors 369 and 372, two black women, because they chatted with each other during the voir dire process and gave other indications of boredom and disdain for the process. . . . inattentive or uninterested. If the trial court believes the prosecutor's explanation, a reviewing court ordinarily should give this credibility finding 'great deference.'") (quoting *Batson*, *supra*), *cert. denied*, 488 U.S. 996 (1988); *Stays v. Herbert*, No. 01 Civ. 2400, 2003 WL 22765352, *4 (E.D.N.Y. Nov. 24, 2003) (crediting prosecutor's race-neutral explanation that juror was inattentive because she yawned several times, had her eyes closed and did not answer a question posed by the court).

Since the prosecutor offered a facially neutral explanation, thereby satisfying the second *Batson* step, the Court must now move to the third step, which "involves evaluating 'the

persuasiveness of the justification' proffered by the prosecutor." *Rice v. Collins*, __ U.S. __, 126 S. Ct. 969, 974 (2006) (quoting *Purkett*, 514 U.S. at 765). However, the "'ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* (quoting *Purkett*, 514 U.S. at 765). The Supreme Court has treated the notion of "intent to discriminate" as a "pure issue of fact, subject to review under a deferential standard." *Hernandez*, 500 U.S. at 364 (citing *Batson*, 476 U.S. at 98). The Supreme Court justified this treatment on the basis that the finding of intent to discriminate "'largely will turn on evaluation of credibility.'" *Id.* (quoting *Batson*, 476 U.S. at 98 n. 21). Thus, in the "typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.*  Noting that there "seldom will be much evidence bearing on that issue," the court observed that the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* The Supreme Court reiterated in *Hernandez* that "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).

Of course, the "precise formula" used to review a court's factual findings "depends on the context." *Id.* In *Rice v. Collins*, the Supreme Court noted that on direct appeal in federal court, "the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error." 126 S. Ct. at 974 (citing *Hernandez*, 500 U.S. at 364-66). However, under AEDPA, "a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rice*, 126 S. Ct. at 974 (quoting 28 U.S.C. § 2254(d)(2)). Thus, in *Rice*, the Supreme Court reasoned that because it was

sitting in federal habeas review, that it only could grant petitioner's *Batson* claim "if it was

unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.*[3]

With these legal precedents in mind, the Court now must examine the trial court's

credibility determination. The day after jury selection was completed, the trial court revisited the

*Batson* issue, making the following statement *sua sponte*:

> The Court:     I'd like to place one matter on the record, as long as we're talking
> about *Batson* challenges. There were two *Batson* challenges, two
> African-American juror challenges were allowed because the
> Court took Mr. Huether's word as an officer of the Court that the
> two jurors were not paying attention, did not seem interested in the
> jury selection process, and that is the reason why the challenge
> were [*sic*] granted. And Mr. Lewis, Mr. Hanlon objected to that,
> and that is a question reserved for appeal.

T.187. Thus, the trial court made an explicit finding that the prosecutor's reasons for striking the

two jurors were credible. The Supreme Court has explained that the "credibility of the

prosecutor's explanation goes to the heart of the equal protection analysis, and once that has

been settled, there seems nothing left to review." *Hernandez*, 500 U.S. at 367. This Court's role,

then, obviously is quite circumscribed. Even though "[r]easonable minds reviewing the record

might disagree about the prosecutor's credibility," on habeas review, "that does not suffice to

supersede the trial court's credibility determination." *Rice*, 126 S. Ct. at 976.

Here, in determining that it should credit the prosecutor's explanation, the trial court

could have relied on several facts in the record: First, the prosecutor "defended his use of

---

[3] Furthermore, the Supreme Court observed, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1) and citing *Miller-El v. Dretke*, 545 U.S. __, 125 S. Ct. 2317, 2325 (2005)). In *Rice*, the parties disputed whether § 2254(e)(1)'s presumption applied in the context of a *Batson* challenge; the Ninth Circuit Court of Appeals, th proceedings below, assumed that it did. *Id.* (citing 365 F.3d at 677). The *Rice* court assumed, *arguendo*, that only § 2254(d)(2) applied in the case before it. *Id.* This Court accordingly will proceed on the same assumption.

peremptory challenges without being asked to do so by the judge," *Hernandez*, 500 U.S. at 369.

Also, the prosecutor did as the Second Circuit suggested in *Brown v. Kelly*, 973 F.2d 116, 121

(2d Cir. 1992),[4] and referred to his contemporaneous notes of his observations of the jurors'

demeanor when he articulated his reasons for removing them from the jury. Furthermore, it

appears that two white jurors were struck based on their lack of attentiveness during voir dire.[5]

The Court notes that Lewis has not provided evidence to "demonstrate[] that a reasonable

factfinder must conclude the prosecutor lied about" the indicia of inattentiveness he observed the

jurors exhibiting and instead struck Juror No. 15 and Juror No. 11 based on their race. *See Rice*

*v. Collins*, 126 S. Ct. at 975-76 ("Viewing the panel majority's concerns together, the most

generous reading would suggest only that the trial court had reason to question the prosecutor's

credibility regarding Juror 16's alleged improper demeanor. That does not compel the conclusion

that the trial court had no permissible alternative but to reject the prosecutor's race-neutral

justifications and conclude Collins had shown a *Batson* violation."). The only question before

---

[4] The Second Circuit has instructed that demeanor evidence, which was offered by the prosecutor to justify his peremptory strikes, must be carefully evaluated:

> An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge. The fact that a prosecutor's explanations in the face of a *Batson* inquiry are founded on these impressions does not make them unacceptable if they are sufficiently specific to provide a basis upon which to evaluate their legitimacy. Yet, because such after-the-fact rationalizations are susceptible to abuse, a prosecutor's reason for discharge bottomed on demeanor evidence deserves particularly careful scrutiny. Prosecutors would be well advised-when contemplating striking a juror for reasons of demeanor-to make contemporaneous notes as to the specific behavior on the prospective juror's part that renders such person unsuitable for service on a particular case.

*Brown*, 973 F.2d at 121.

[5] In the first round, Juror No. 5, Mr. Kwiatowski (white male), was reading a book; he was removed for cause based on the consent of the defense and the prosecution. In the second round, Juror No. 16, Mr. Ignatowski (white male), was removed peremptorily by the prosecutor because the juror "[d]idn't understand what [they] were talking about" and "[l]ooked off."

this Court is whether the trial court's factual determination at *Batson*'s third step was

unreasonable. *Id.* Since nothing in the record "compels the conclusion that the trial court had no

permissible alternative" but to reject the prosecutor's offered race-neutral justifications and

conclude that Lewis had shown a *Batson* violation, the Court cannot find that the trial court acted

unreasonably in crediting the prosecutor's proffered reasons for his peremptory strikes. *Id.* at

975-76. Therefore, the Court cannot grant habeas relief on Lewis's *Batson* claim.

**2.      Ineffective assistance of trial counsel**

In order to prevail on a claim of ineffective assistance of counsel within the framework

established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas

petitioner must satisfy a two-part test. First, the petitioner must demonstrate that counsel's

performance was so deficient that counsel was not functioning as "counsel" within the meaning

of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, the petitioner must show

that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second,

the petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To

establish the "prejudice" prong of the *Strickland* test, the petitioner must show that a "reasonable

probability" exists that, but for counsel's error, the outcome of the trial would have been

different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is

unable to demonstrate first that his counsel's performance was inadequate. *Id.* at 697 ("[T]here is

no reason for a court deciding an ineffective assistance claim to . . . address both components of

the inquiry if the defendant makes an insufficient showing on one.").

**a.      Failure to call petitioner to testify**

Lewis contends that trial counsel forbade him from testifying at trial and deprived him of

-15-

his constitutional right to testify in his own behalf. This claim was rejected when Lewis raised it in support of his motion to vacate the judgment pursuant to C.P.L. § 440.10. In particular, the trial court found that according to the affidavits of Vaughn and Williams submitted by Lewis, Lewis knew that he had the right to make the decision about testifying and was intending to assert it; and that he had opportunities to complain to the court about his failure to testify, such as when trial counsel rested without calling any witnesses and when trial counsel asked the court to charge the jury regarding defendant's failure to testify.

The Supreme Court has held that a defendant in a criminal case has the right to testify on his own behalf. *E.g.*, *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). That right is personal to the defendant, meaning that it can only be waived by the defendant himself. *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997). Here, there does not appear to be any dispute that Lewis was apprised of his right to testify at trial. The only evidence in support of Lewis's contention that defense counsel prevented him from exercising this right is Lewis's bare-bones assertion to that effect. However, co-defendant Williams's affidavit, which Lewis submitted in support of his C.P.L. § 440.10 motion, actually contradicts this assertion. Williams described the following encounter:

> Lewis and his attorney had disagreements about Lewis testifying. Nelson felt that his only defense was to have me and Vaughn to testify in his behalf. However, Mr. Hanlon [defense counsel] aggressively told Mr. Lewis that he wasn't testifying. Nelson implicated [*sic*] that when the judge asks him, he's going to do so anyways [*sic*]. Mr. Hanlon then said "OK," and walked away.

Affidavit of Wayland Williams, Respondent's Exhibit ("Exh.") S at 132 (Docket #4). However, Lewis never informed the trial judge of this incident or of his desire to testify. Furthermore, there is no evidence in the record that Lewis and his attorney were having a disagreement about whether Lewis should testify.

There is a post-trial letter from Lewis's defense counsel which does give the Court some pause. In it, defense counsel advised Lewis about issues to be raised in connection with his collateral motion to vacate the judgment and essentially encouraged him to argue that he did not receive competent representation at trial:

> There is no inquiry by the Court as to such testimony [regarding petitioner's failure to testify] on the record. It is this failure which always permits you to argue you wanted to testify. This may also be included in your appellate brief merely by its absence. [*sic*] One of the purposes of the [C.P.L. §] 440 [motion] was to attempt to force them to put me on the stand, because I would have testified on the last day that I had spoken to the Court about not putting you on the stand in the back hallway, but that when I came out to confirm with you, were again adamant about testifying, and had never agreed not to testify. Your failure to testify is also explained by the Court's improper instruction that all legal strategies were to be mine, which you can argue "put a muzzle" on you for the trial. Do not be afraid to share this with appellate counsel. . . . But it is improper for me to argue on appeal that I was ineffective at trial. Courts do not look well upon this.

December 15, 2000 Letter from Defense Counsel to Petitioner, Exh. S at 135 (Docket #4). This letter strikes the Court as disturbingly disingenuous. Furthermore, to the extent that counsel's letter can be read as stating that he refused to allow his client to testify, Lewis still cannot make out a claim of ineffectiveness. This is because, in addition to proving that counsel acted unreasonably, he must also demonstrate that he was prejudiced by counsel's error. However, Lewis has not shown how his testimony would have changed the result of the trial. *See Brown v. Artuz*, 124 F.3d 73. (2d Cir. 1997) (rejecting claim of ineffective assistance of counsel premised on defendant's failure to testify where there was " no reasonable probability that the verdict would have been different" had defendant's proposed testimony been presented to the jury); *accord Allen v. Breslin*, No. 05 CV 1580(ARR), 2005 WL 2591804, at *10 (E.D.N.Y. Oct. 13, 2005).

In fact, Lewis's proposed trial testimony was directly contradicted by his signed statement to police in which he admitted that he knew Williams and Vaughn intended to let the victim pay for his eight-ball of cocaine and "then just whup [*sic*] his ass and take the rest of his money." Petitioner's Pre-Trial Statement, Resp't Exh. F at 52 (Docket #4). Had Lewis taken the stand and testified that no robbery was intended, his pre-trial inculpatory statement would have provided fodder for decimating cross-examination by the prosecution; indeed, given these circumstances, counsel arguably would have been remiss had he recommended that Lewis testify. In all likelihood, the jury would have rejected Lewis's testimony at trial as self-serving and inherently unworthy of belief, given that he had provided a voluntary written statement admitting that he knew a robbery and at least an assault were going to occur that night. Because Lewis cannot satisfy either the first or second prongs of *Strickland*, habeas relief is not warranted on this claim.

### b.      Failure to call witnesses

Lewis contends that trial counsel erred in failing to call Shanika Henry, his girlfriend. He alleges that Henry would have testified that she and Lewis decided not to report the murder (which Lewis described as having been committed by Vaughn) out of "fear of reprisal and safety of their two small children from co-defendant Vaughn whom defendant Lewis did not know well." Petitioner's C.P.L. § 440.10 Motion, Resp't Exh. C at 19.

Lewis also alleges that co-defendant Williams would have testified that "Lewis never participated in a planned robbery nor was it ever intended to be a robbery, before arriving at [the] deceased[']s apartment or as an afterthought upon arrival thereof [*sic*]." Petitioner's C.P.L. § 440.10 Motion, Resp't Exh. C at 19. According to Lewis, Williams would have testified that

Lewis came with them to DiVita's apartment because Lewis wanted to ask DiVita to use his apartment as a "gate" out of which to sell drugs. *See id.* at 20. Furthermore, Williams allegedly would have testified that after Lewis found out that DiVita had been shot, he ordered Williams and Vaughn out of his vehicle. *Id.* at 21.

Finally, Lewis asserts that trial counsel should have called co-defendant Vaughn. Vaughn provided an affidavit which omitted any mention of a plan to rob DiVita or what transpired at DiVita's apartment; it merely stated that Lewis drove Vaughn and Williams to DiVita's apartment so that Williams could ask DiVita to use his apartment as a "gate." According to Vaughn, Lewis informed them that "he would be parked across the street from the apartment building rolling his blunt (marijuana) in the parking lot." Affidavit of James Vaughn, Resp't Exh. G at 62. Vaughn stated that when they returned to the vehicle and informed Lewis as to what had occurred, Lewis "became upset and . . . refused to return [them]" to their destination. *See id.*

When Lewis raised these contentions in support of his C.P.L. § 440.10 motion to vacate the judgment, the trial judge held that "it was not the defendant's decision, but that of his attorney, whether the codefendants should have been called to the stand." Order Denying C.P.L. § 440.10 Motion (citations omitted), Resp't Exh. H at 73.  "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Neresian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Because such decisions "fall squarely within the ambit of trial strategy," they will not constitute a basis for an ineffective assistance claim provided that they are "reasonably made." *Id.*; *accord United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992). As

discussed below, in the present case, there is no question in this Court's mind that trial counsel acted reasonably in not attempting to call Henry, Williams or Vaughn in support of the defense case.

Turning first to Henry, I find that her testimony was not material to evaluating whether or not Lewis actually participated in the crime. Had she testified that Lewis was fearful of Vaughn, and refrained from notifying the police about the murder for that reason, that testimony at most would have supported a claim of duress–which was not Lewis's defense. To the contrary, the theory of the defense was that Lewis was not at all involved in the robbery or the murder. Thus, Henry's testimony would not have advanced Lewis's cause.

With regard to the co-defendants, I note that Williams's post-trial claim in his affidavit that he was prepared to testify for Lewis is fatally undermined by the fact that Williams did not even testify in his *own* behalf at trial. In light of this, there is no reasonable likelihood that Williams's counsel would have allowed his client to testify at trial on behalf of Lewis, and subject himself to unlimited cross-examination–something Williams obviously wished to avoid since he did not testify in his own defense. Although Vaughn testified at trial, I note that he had given a statement to the police in which he asserted that it was *Lewis* and Williams who had planned to rob DiVita. If Vaughn had purported to do an about-face and testify so as to exculpate Lewis, Vaughn would have been subjected to withering cross-examination based on his earlier statement to the police inculpating Lewis in the crime. That type of recantation testimony, which is highly unreliable and rightly viewed with suspicion, would not have been beneficial to Lewis's case.

Because Lewis is unable to demonstrate a reasonable probability that the outcome of his

trial would have been different had Henry, Williams or Vaughn testified, he cannot show that he was prejudiced by trial counsel's failure to call them. As a result, his ineffective assistance claim must fail.

**V.    Conclusion**

For the reasons stated above, Nelson Lewis's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Lewis has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:    June 20, 2006
          Buffalo, New York.